**UNITED STATES of America,**
**Plaintiff,**

v.

**Morris H. GREENBERG, Defendant.**

**No. 3–70 CR. 104.**

United States District Court,
D. Minnesota,
Third Division.

Oct. 18, 1971.

Robert G. Renner, U. S. Atty., by Peter J. Thompson, St. Paul, Minn., for plaintiff.

Maslon, Kaplan, Edelman, Borman, Brand & McNulty, by Irving R. Brand, Samuel L. Kaplan, and Ralph Strangis, Minneapolis, Minn., for defendant.

NEVILLE, District Judge.

Defendant, a practicing attorney of many years residing at Eveleth, Minnesota, was indicted September 23, 1970. He was charged with misdemeanors in five counts i.e., failure to file Interest Equalization Tax Returns covering various periods and certain transactions, in violation of 26 U.S.C. § 7203. The Sixth count of the indictment charged defendant with a felony by the filing of a false income tax return, paying a tax of $2,189.49 against an amount due and owing of $9,728.18. Defendant pled not guilty to all counts on November 25, 1970. On July 19, 1971, defendant and his counsel informed the court that he desired to change his plea and to enter a plea of guilty to Counts I and II, the United States Attorney stating that at the time of sentencing the government would dismiss misdemeanor Counts III, IV, V and Count VI, the felony count. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, even though defendant himself is an attorney of wide experience and many years practice, the court personally, together with the United States Attorney, interrogated him as to his understanding of the consequences of his guilty plea, the voluntariness thereof and his knowledge of his rights. The court was satisfied, and defendant's counsel substantiated such, that defendant was acting voluntarily with full knowledge of the consequences and cognizant of his rights. Particularly defendant was asked and stated that

he had received no promise from the court or otherwise as to what sentence would or might be imposed. The court further determined to its satisfaction that there was a factual basis for the plea.

Following the plea the court obtained a presentence report from the probation officer of the court and on September 7, 1971 imposed as a sentence under Count I a fine of $10,000 plus a period of five years probation, conditioned that defendant use best efforts under the aegis of the probation officer to pay his civil tax liability. On Count II the court committed defendant to the custody of the Attorney General for imprisonment for a period of 90 days. On request of defendant's counsel the court stayed execution of the sentence for 45 days to the end that defendant might arrange his business affairs to accommodate the 90 days absence. The motion of the United States Attorney to dismiss Counts III through VI was granted.

It is apparent that the 90 day jail term imposed under Count II is principally what rankles with defendant. The bulk of the argument by his counsel for reduction of sentence was directed to this feature.

The court gave a deal of consideration to this case before imposing sentence. Numerous letters were received by the probation officer and transmitted to the court attesting to defendant's excellent reputation as a practicing lawyer, importuning the court to grant leniency. The court's initial and preliminary approach was that the Interest Equalization Tax is a little known tax, not generally criminally enforced and perhaps easily or inadvertently overlooked by one owning, selling and dealing, as in this case, in capital stocks in Canadian companies. The presentence report however contains a copy of a letter written by defendant well before the interest equalization tax was enacted by Congress in 1964 showing his acquaintance with and knowledge of the prospective tax. It reads in part as follows:

"There is in the United States a measure being discussed in Congress which would be a tax on American purchases of foreign securities which tax I believe if reduced to law would be 15%. I understand, however, that there is a provision for exemption if 60% or more of the stock is owned by American citizens."

By the statement of defendant's own counsel, considerable effort was made at the Washington, D.C. level after passage of the law to secure a ruling or interpretation that defendant's transactions or certain of them were exempt or were not covered by the law. This resulted in a decision or ruling adverse to defendant some time in 1965. Still no tax returns ever were filed, nor any procedure taken to test the law in the tax courts nor to pay the tax and claim a refund. Over the years defendant dealt in, sold or owned and invested in stocks of eight different Canadian corporations. Counsel's explanation to the court is twofold both of which the court deems inadequate. First, it is asserted that defendant did not keep adequate records, despite the requirements of 26 U.S.C. § 6001 and other sections of the Internal Revenue Code and therefore since it has been impossible to trace or reconstruct all his transactions he should not be held accountable therefor and second, at all times since 1965 the Internal Revenue Service from time to time has been examining defendant and his activities and thus the government was fully advised of his transactions, thereby negating any criminal intent in failure to file returns.

Upon the above facts, the court concluded that defendant's failure to file interest equalization tax returns was not accidental nor inadvertent, but purposeful and intentional. The court's original and preliminary impressions dissipated. The revenue agents determined "for the purpose of prosecution defendant purchased stock totaling $40,757.26 on which he owes $6,113.58 in equalization taxes."

Apart from the interest equalization tax, a look at defendant's past activities as shown in the presentence investigation report reveals the following:

"Defendant previously was under investigation by the Intelligence Division of IRS in 1958 and 1959, covering the years 1946 through 1956. Prosecution was not recommended, and the case was closed with defendant paying additional taxes and penalties totaling $51,915.91."

Further, the internal revenue agent's report (not of course verified or substantiated by any court proceedings) shows for the years 1958 through 1964 defendant declared a taxable income of $18,669.83 when the true figure is $263,081.01. Be that as it may, the court should properly disregard this because strictly speaking there has been no evidentiary proof of these figures and the felony tax evasion count VI in the indictment was dismissed.

Defendant was president and principal executive officer of a Canadian corporation, Sapawe Gold Mines Ltd., formerly Lindsay Explorations Ltd., from March 1961 until October 2, 1964. During this time, a large number of unregistered shares of Canadian Gold Mine stock were sold in the United States, to the point where on March 19, 1963, Honorable Gunnar H. Nordbye of this court permanently enjoined the company, its officers and agents from further violating the registration provisions of the Securities and Exchange Act. Defendant was not included as a defendant in the suit. The court stated because defendant's counsel challenged the relevance of this proceeding to the case at bar that he would examine this file, 5–63 Civ. 8, and has done so. Affidavits filed therein by government agents reveal the corporation sold some 500,000 shares of unregistered stock in 1962, 50% thereof to citizens of the United States; that the corporation was on a "Canadian restricted list"; " * * * whose securities the Commission has reason to believe have been or currently are being distributed in the United States in violation of the registration requirements of the Securities Act of 1933"; that "Greenberg admitted to affiant that he knew defendant corporation was on the 'Canadian Restricted List' "; that in total approximately 2,-500,000 shares are owned by residents of United States. Defendant's complicity with this case cannot well be denied.

Perhaps the most condemning statement relative to defendant's past activities comes from and is signed by the defendant himself in the form of a letter dated August 26, 1971 addressed to the probation officer, in which he states:

"However, I wish it to be perfectly clear that to my knowledge, there was, for the years 1960–1964, unreported income outside of the allegations of the Government's indictment. Specifically, for the period from 1962–1964, although I don't know the amount, there were substantial funds paid to my daughter, Barbara, by me as described hereinafter, all of which I knew, and further, sums paid to me which were taken by my son, Malcolm, which was not known to me until subsequent to the Internal Revenue investigation. Beyond the above two circumstances, I honestly do not know of any other liability to the United States for unreported income, but know that the state of my records was and is such as not to negative the possibility of other unreported income.

* * * She [the daughter] apparently began to rely on my help, and even began writing checks on my account. On several occasions, I refused to honor these checks, but on many, was contacted by county attorneys proceeding with prosecutions for her bad checks. Ultimately I would honor the checks, contrary to both the advice of my friends and family. I continued to help her, and 'am now' advised that for the period of 1960–1964 alone, she wrote in excess of $80,000.-00 on my account. I continue to help her to date, but in lesser amounts.

This money paid to her was clearly income to me, it should have been reported, but wasn't. I know this is wrong and can't justify it, but can only hope you understand that I didn't do this for any reason but for the love of my child and her children.

\* \* \* \* \* \*

Although, clearly, both Barbara's and Malcolm's money was taxable to me, I didn't report this income, for which, at least in Barbara's situation, I am wrong, and clearly, owe tax for both Malcolm's and Barbara's income."

Defendant's counsel states that this was an ill-advised letter, written by a disturbed man, without advice of counsel, though written on defendant's own law office stationery and that defendant now wishes to repudiate it. No explanation was given, however, as to why or how this money would not in fact be income to defendant. Certainly the payments of $81,000 and other payments were not business deductions nor exempt contributions.

■■ Considered all in all the court believes the sentence imposed, including 90 days of jail time, is reasonable and as lenient as defendant can expect. A strange concept seems to have grown up that although a misdemeanant could expect to receive 90 days in a jail or in the workhouse for driving while under the influence of intoxicants, even speeding if repeated, shoplifting, vagrancy or plain drunkenness, nevertheless a taxpayer who fails to pay taxes amounting into the thousands of dollars should merely be "slapped on the wrist" and given probation. Jail to the white collar criminal seems to be anathema. Little deterrent effect is accomplished as to others if a town's prominent citizen— and a lawyer withal—can fail to file returns and not pay taxes and receive more lenient treatment than someone who, for instance, forges a $50 government check, or receives $10 by holding up an oil station. Grant that there is a difference between crimes of violence and nonviolence, yet if anyone had embezzled or obtained by fraud through the mail the amount of money involved in the case at bar, no one would seriously contend that a 90 day jail term and a fine was an unduly harsh sentence. Further, to honor the plea that because defendant is 72 years of age or is not in the best of health and thus ought to be treated more leniently is to say that the penalties of the criminal law, though applying to the younger and more healthy should not apply to those over a certain age and evidencing the infirmities of their years. Defendant's counsel has urged that a jail term will be detrimental to defendant's health. The presentence report contains no mention of any condition of ill health on the part of defendant but *ex parte* and following the hearing on this motion to reduce sentence, defendant's counsel presented a letter from a doctor describing defendant as suffering from a number of maladies and opining that time spent in jail will be injurious to his health. The court is not impervious, though defendant outwardly seemed in good health at his court appearances. The federal institutions have adequate medical facilities and the court feels certain that if defendant's health so warrants he will receive proper medical attention. The experience of course is bound to be distasteful and perhaps socially humiliating to defendant, but, trite though the thought is, such should have been considered by defendant before the commission of the offense.

Following the imposition of sentence, there arrived on the court's desk the September 1971 Federal Rules Decision advance sheet. At 52 F.R.D. 481 appears an article by Honorable Gus J. Solomon, Chief Judge, United States District Court, District of Oregon, wherein he states (at p. 484) in speaking of sentences in tax cases:

"I believe it is necessary to impose jail sentences upon these defendants as a warning to others that unless they pay their taxes, they may get the same treatment. This is particularly true if the defendants are well-known

persons of respectability and high social status. You can feel sorry for a friend who was convicted of income tax fraud, but you can relate his situation to your own better if he got a jail sentence. The impact is greater. We know that the Department of Justice recommends jail sentences in practically every income tax case. A recent memorandum prepared by the Chief of the Criminal Section of its Tax Division supports the Department's conclusion that when prison sentences are imposed, the number of infractions of the revenue laws will be reduced.

\* \* \* \* \* \*

*I believe that jail terms should be imposed in most cases, and the more prominent the individual the more compelling the reasons for jail time. I say jail time because I believe that a jail sentence of 60 or 90 days will usually have the same general deterrent effect as a prison sentence. There are occasions when I believe it is appropriate to also fine the defendant.*" [Emphasis added]

This court agrees with this expression.

Defendant's alternative motion to withdraw his plea of guilty is not timely under Rule 32(d) of the Federal Rules of Criminal Procedure which reads as follows:

"(d) Withdrawal of Plea of Guilty. A motion to withdraw a plea of guilty or of *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea."

■ The court is impressed that defendant's desire to withdraw his plea is motivated by the fact that he did not expect a jail sentence. The fact that the sentence is more severe or different than a defendant expected or hoped is not "manifest injustice" within the meaning of Rule 32. See the American Bar Association Tentative Draft of Standards Relating to Pleas of Guilty (1967) Sec. 2.1, which sets forth situations comprising manifest injustice and which does not include the posture of the case at bar.

A collection of cases from nearly every Federal Circuit Court of Appeals is collected in 9 A.L.R. Fed. 309, 373 supporting the statement:

"§ 22. Surprise or disappointment by severity of sentence

The following cases held or recognized that a defendant does not show 'manifest injustice' and is not entitled to withdraw a guilty plea after sentence pursuant to Rule 32(d) because of his disappointment in the unexpected severity of the sentence imposed, absent a showing that any expectations of leniency were specifically induced by the government."

A separate order has been entered. Defendant will surrender himself to the United States Marshal at Minneapolis, Minnesota at 10:00 A.M. on Tuesday, October 26, 1971. The United States Marshal advises that within an hour from his surrender defendant will be transported to Sandstone, Minnesota, where he will forthwith have a complete medical examination. The court has requested the prison authorities to transmit a medical report to the court. If it should appear as defendant claims that 90 days of imprisonment will endanger defendant's health, the court will upon a showing and appropriate motion give consideration to an earlier release.